CAROLYN L. JOHNSON, Employee, Plaintiff,
v.
BAXTER HEALTHCARE CORP. f/k/a TRAVENOL LABORATORIES, INC., Employer, Self-Insured, Defendant.
No. COA09-579.
Court of Appeals of North Carolina.
Filed February 16, 2010.
This case not for publication.
Cox and Gage PLLC, by Robert H. Gage, for plaintiff-appellee.
Gray King Chamberlin & Martineau, LLC., by L. Kristin King and Jennifer P. Pulley for defendant-appellant.
WYNN, Judge.
Between 1983 and 2000, while employed by Defendant Baxter Healthcare Corp., Plaintiff Carolyn Johnson suffered four compensable injuries, for which she has had eleven surgeries. In this appeal, Defendant argues that the Full Industrial Commission erred in finding that Plaintiff was disabled from employment and concluding that she was entitled to additional medical compensation. We disagree, and therefore affirm the Opinion & Award of the Full Industrial Commission.
Plaintiff, born in 1944, last attended school in 1959 and completed the ninth grade. Defendant first employed her in 1979. Until January 2002, plaintiff worked as a "carton erector," opening and fastening corrugated cartons, then placing them on an overhead conveyor, ready to accept the bags of intravenous saline solution which are produced by Defendant's plant.
While at work in May 1983, Plaintiff slipped and twisted her right foot, ankle, and knee (injury no. 1). Dr. Anderson initially treated her. He diagnosed right knee strain and a small tear to the medial meniscus. Beginning in May 1984, Dr. Jarrett, an orthopedist, treated Plaintiff for right knee pain. Dr. Jarrett diagnosed a torn medial meniscus. Plaintiff continued to work until 6 May 1985, when she had a right knee arthoscopy performed by Dr. Jarrett (Surgery no. 1). Plaintiff returned to work on 20 May 1985. On 12 June 1985, Defendant accepted the right knee injury as compensable on a Form 21 agreement.
On 6 February 1986, Plaintiff injured her left knee when she hit it against a metal wrap holder, part of a Box Machine (injury no. 2). She had a left knee arthroscopy performed by Dr. Jarrett on February 26, 1987 (Surgery no. 2). Defendant accepted the left knee injury as compensable on a Form 21 agreement dated 16 March 1987. Plaintiff returned to work on 1 April, 1987.
On 14 June 1989, Plaintiff had another right knee arthroscopy (Surgery no. 3) performed by Dr. Jarrett. She returned to work four weeks later. Plaintiff was next treated by Dr. Welliver, an orthopedist, beginning in September 1989. Dr. Welliver diagnosed osteoarthritis of the right knee, severe degenerative joint disease of the right knee, and mild degenerative arthritis of the left knee.
On 9 February 1990, Plaintiff had two surgeries performed by Dr. Welliver, one on the left knee and one on the right knee (Surgeries nos. 4 and 5). Plaintiff returned to work after four weeks.
On 22 January 1993, Plaintiff had left knee arthroscopy surgery performed by Dr. Welliver (Surgery no. 6). And on 9 March 1993, she had right knee arthroscopy surgery performed by Dr. Welliver (Surgery no. 7). Plaintiff returned to work 26 March 1993.
On 4 August 1995, Plaintiff had right knee arthroscopy performed by Dr. Welliver (Surgery no. 8). She returned to work on 25 August 1995. In September 1995, Dr. Welliver reported that "the patient's current state of affairs is directly related to the injury sustained in 1983." Dr. Welliver later recommended Plaintiff undergo total knee replacement on the right. Dr. Jansen agreed with this recommendation in 2002 after evaluating Plaintiff upon referral from Dr. Cammarata.
On 23 November 1999 Plaintiff was struck by a sterilizer truck at work and knocked into another sterilizer truck (injury no. 3). She suffered injuries to her left hand, cervical spine, and face. Dr. Chung treated Plaintiff for these injuries from November 1999 through March 2000. Plaintiff missed one day of work due to this injury.
On 30 May 2000 Plaintiff saw Dr. Hoski, who diagnosed a cervical sprain or strain and degenerative changes previously asymptomatic. He noted that Plaintiff had reached maximum medical improvement as of that time. He assigned a four percent permanent partial impairment rating to the plaintiff's back. He also noted that Plaintiff had continued back pain. He recommended that Plaintiff be treated with anti-inflammatories and physical therapy, rather than surgery. Dr. Welliver last treated Plaintiff on 17 August 2000. At that time, he diagnosed bilateral inflammatory synovitis and bilateral significant degenerative joint disease.
On 30 October 2000, Plaintiff saw Dr. Cammarata for pain, weakness, and instability in her left thumb resulting from the 23 November 1999 accident.
On 7 December 2000, Plaintiff was loading a bundle of cartons into her machine when the bundle fell. She tried to grab it and felt pain in her right arm and shoulder (injury no. 4). Dr. Cammarata, an orthopedist, evaluated Plaintiff for complaints of right arm pain and deformity on 15 December 2000. He diagnosed a right proximal biceps tendon rupture. He also noted some AC joint arthritis. Plaintiff continued to work until 19 December 2000, when she had surgery by Dr. Cammarata. (Surgery no. 9). Dr. Cammarata performed the surgery to repair the ruptured biceps tendon. He discovered during surgery that Plaintiff had also sustained a massive rotator cuff tear on her right shoulder as well as the complete rupture and retraction of the biceps tendon.
On 12 January 2001, Plaintiff returned to work on light duty. When Defendant employer was unable to accommodate her light duty restrictions, Plaintiff left work on 2 March 2001. Defendant accepted Plaintiff's 7 December 2000 injury to her right arm and shoulder as compensable on 8 March 2001.
On 11 June 2001, Plaintiff had surgery on her left thumb, performed by Dr. Cammarata (Surgery no. 10). Defendant accepted Plaintiff's 23 November 1999 injury to her left hand, neck, and face as compensable on 3 July 2001.
On 16 October 2001, Plaintiff underwent a Functional Capacity Evaluation which determined that she did not meet the essential physical demands of the carton erector position. On 19 October 2001, Dr. Cammarata indicated that Plaintiff was restricted to work at a sedentary level, with grasping limited to "occasional" with her left arm. He noted that Plaintiff should not use her right arm to reach forward and overhead work should be limited to "occasional" with both arms.
Defendant procured a written description of an alternative job proposed for Plaintiff. The Physical Demands Analysis for the job, dated 3 October 2001, indicated that Plaintiff would be working eight hours per day, inspecting units on a moving conveyer, and pulling approximately three hundred defective bags from the line in an eight hour shift (an average of 37.5 bags per hour), exerting a pulling force of 10 to 30 pounds each time. The analysis indicated that the job required reaching above the shoulder up to 33 percent of the time, reaching below shoulder-level, reaching across and reaching to floor level, each, up to 33 percent of the time.
Defendant obtained a second Job Analysis of the packing inspector job, dated 15 November 2001. This analysis indicated that the number of bags to be removed per hour was 10 to 25, and that the employee could stand on a platform to reach the bags. It did not address reaching above shoulder level or the force required to pull each bag. The job analyst was told that an adjustable chair would be provided. Plaintiff was later told that Defendant could not get her a chair without getting one for everybody else. Plaintiff never got the adjustable chair. Dr. Cammarata approved the 15 November 2001 Job Analysis for Plaintiff on 30 November 2001.
Plaintiff returned to work at the inspection job on 5 January 2002, working the 12-hour weekend shift. Defendant's witness Dennis Noblitt testified that over forty defective bags per hour were pulled in the fourth quarter of 2002, but that higher numbers of defective bags were pulled in early 2002, when Plaintiff was working at the inspection job. The video of the inspection job supplied by Defendant shows 12 bags pulled in five minutes, eighteen seconds. This is an average of 135 bags per hour. The operator is shown reaching over head level to pull down each bag using two hands to grasp and pull the bags.
Three witnesses established that the bag inspector needed to extend his/her neck to look upward to see the bags as they run by on the line. Ms. Taylor testified that she had to pull hard with both hands to get defective bags off the line. Plaintiff kept a contemporaneous written record of the number of bags that she pulled from the line. On 16 February 2002, she pulled an average of 52 bags per hour; on 24 February 2002, she pulled an average of 49.6 bags per hour; on 3 March 2002, she pulled an average of 64.4 bags per hour.
On 18 February 2002, Plaintiff saw Dr. Cammarata. He reiterated that Plaintiff should not be pulling more that 25 bags per hour. He noted that she was showing symptoms of radiclopathy from the cervical spine, for which he recommended treatment. He also referred Plaintiff for further evaluation for a total knee replacement. Plaintiff was evaluated by Dr. Jansen on 21 February 2002 at the request of Dr. Cammarata. Dr. Jansen diagnosed severe right knee medial compartment degenerative joint disease with varus malalignment.
Plaintiff continued to have pain, tingling, numbness and loss of feeling in her arms when performing the inspection job. Plaintiff testified that as she continued to work, her symptoms worsened and her right hand would become "completely dead." She also stated that she reported the problem to her supervisor, but nothing was done about it. Plaintiff continued to work at the inspection job until 24 March 2002.
On 2 April 2002, Plaintiff saw Dr. Earwood and reported tingling and numbness in both arms and neck pain. Dr. Earwood ordered an MRI of the neck. The MRI showed degenerative changes of the cervical spine and narrowing of the nerve openings with joint hypertrophy, more severe on the right. These findings correlated with Plaintiff's symptoms of pain and numbness in her neck and arms.
Dr. Earwood wrote a letter dated 3 April 2002. Dr. Earwood noted Plaintiff's symptoms and concluded that her problems had worsened since she had seen Dr. Hoski on 30 May 2000. The letter recommended that Plaintiff be reevaluated by Dr. Hoski to consider further treatment for the injury. Dr. Earwood opined that Plaintiff should not use her arms to perform any reaching, grasping, lifting, or repetitive work.
On 23 April 2002, Plaintiff returned to Dr. Cammarata who noted that the MRI correlated with Plaintiff's symptoms of pain in the neck with radiation into both upper extremities. Dr. Cammarata agreed with Dr. Earwood that Plaintiff should be reevaluated by Dr. Hoski.
Dr. Hoski saw Plaintiff on 19 June 2002. He concluded to a reasonable degree of medical probability that Plaintiff's current symptoms were due to her 23 November 1999 work related injury. Dr. Hoski opined that Plaintiff had a change in her condition and she was no longer at maximum medical improvement, and now needed surgery. Plaintiff was paid temporary total disability benefits starting 19 June 2002.
On 15 August 2002, Dr. Hoski performed a cervical diskectomy and fusion (surgery no. 11). On 30 October 2002, Dr. Hoski restricted Plaintiff from any prolonged flexion or extension of the neck, and specified that she should not keep her neck extended or flexed for more than one-third of the day. He released her to return to work as of 15 November 2002.
On 1 November 2002, Plaintiff saw Dr. Earwood. On 7 November 2002, Dr. Earwood wrote a letter to Defendant regarding Plaintiff's inability to work. At his deposition, Dr. Earwood confirmed that his opinion to a reasonable degree of medical certainty was that, as of 7 November 2002, Plaintiff was not able to perform the inspection job.
On 10 December 2002, Plaintiff returned to Dr. Hoski, reporting constant pain in her right shoulder and difficulty using her arms. Dr. Hoski referred Plaintiff to Dr. Fleck, a board-certified neurologist and spinal rehabilitation specialist, for recommendations regarding pain management techniques and functional restoration.
Plaintiff first saw Dr. Fleck on 19 December 2002. Dr. Fleck diagnosed neck pain and functional limitation, interruption of normal activities, ability to work, and sleeping. Dr. Fleck restricted Plaintiff to sedentary work, meaning occasional lifting of up to 10 pounds, no lifting from below the knee or above the shoulder, no prolonged work at or above shoulder level or climbing. Further, Plaintiff needed to change positions frequently and avoid an isolated fixed position of either the neck or the upper extremity. Dr. Fleck wrote, "If these restrictions cannot be accommodated, patient cannot work." Dr. Fleck recommended that Plaintiff seek treatment with Dr. Hanson, a pain management specialist.
On 12 February 2003, Dr. Hoski again evaluated Plaintiff. He noted Plaintiff's functional neck range of motion and improvement in upper extremity pain, but continued numbness in the arms. He released her with lifting restrictions of twenty-five pounds.
Dr. Hanson began his treatment of Plaintiff beginning on 26 February 2003. Dr. Hanson diagnosed cervicalgia, degenerative cervical spinal disease, and cervical facet syndrome. His treatment included cervical injections and ultimately cervical facet radiofrequency ablation. Plaintiff returned to Dr. Hanson in July 2006. He continued Plaintiff on OxyCotin and prescribed Klonopin.
Dr. Fleck saw Plaintiff again on 8 September 2003. The option of physical therapy in the form of work hardening was considered, and rejected. Dr. Fleck was of the opinion that work hardening would pose a threat to Plaintiff, and might aggravate her symptoms.
Defendant did not provide Plaintiff a job that would accommodate her medical restrictions as given by Dr. Fleck.
Dr. Fleck last saw Plaintiff on 6 October 2003. After consultation with Dr. Hoski, Dr. Fleck assigned a 15 percent permanent partial impairment rating to Plaintiff's spine. Dr. Fleck opined Plaintiff to be at maximum medical improvement of her 23 November 1999 injuries. Dr. Fleck did not address Plaintiff's return to work in light of the fact that Plaintiff had elected early retirement.
Beginning 17 November 2003, Dr. Earwood provided care for Plaintiff as her authorized treating physician. Dr. Earwood testified that between 7 November 2002, when he wrote to Defendant stating that Plaintiff could not work, and 20 November 2006, Plaintiff's problems remained constant. The thumb of her left hand was locking; her arms were numb and tingling; her right knee kept her awake at night with pain; she had popping pain and stiffness; she had pain and tingling down both arms; her trapezius muscles were stiff and sore; she was stiff in the knees and hips; her arms would go numb when she was driving; her right leg hurt worse than her left; she could not lift heavy weight and had a lot of trouble with her pain.
On 26 May 2005 Plaintiff filed a Form 33, alleging that she was totally disabled and entitled to additional worker's compensation benefits. Defendant filed a Form 33R dated 25 July 2005 asserting that Plaintiff's complaints and treatments were not causally related to her accepted workers' compensation claim. On 8 November 2005, the cases were consolidated for mediation by Order of the Industrial Commission. Following an impasse in mediation, the matter was set for hearing.
The matter was heard before Deputy Commissioner Adrian A. Phillips on 12 June 2006. Deputy Commissioner Phillips entered an Opinion & Award on 31 August 2007, which denied Plaintiff's claim for additional disability benefits pursuant to N.C. Gen. Stat. § 97-29, but awarded compensation to Plaintiff under N.C. Gen. Stat. § 97-31 for her permanent partial impairment.
Plaintiff timely appealed to the Full Commission. A hearing was held on 18 March 2008. The Full Commission entered an Opinion & Award on 26 November 2008 reversing Deputy Commissioner Phillips' Opinion & Award. The Full Commission awarded Plaintiff disability compensation under N.C. Gen. Stat. §§ 97-29 and 97-31 and awarded Plaintiff additional medical compensation under Hyler v. GTE Products, Co., 333 N.C. 258, 425 S.E.2d 698 (1993), and N.C. Gen. Stat. § 97-25. The Full Commission entered an Amended Opinion & Award on 8 January 2009 modifying the previous Opinion & Award to include an award of a N.C. Gen. Stat. § 97-42 credit to Defendant.
Defendant timely filed appeal to this Court arguing that the Full Industrial Commission erred in (I) finding and concluding that plaintiff was disabled from all employment, (II) concluding that plaintiff did not unjustifiably refuse suitable employment, and (III) finding and concluding plaintiff was entitled to additional medical compensation.
Preliminarily, we note that the Supreme Court of North Carolina has set out the appropriate standard for our review of Industrial Commission decisions:
In considering this issue, we reiterate that when reviewing Industrial Commission decisions, appellate courts must examine "whether any competent evidence supports the Commission's findings of fact and whether [those] findings ... support the Commission's conclusions of law." The Commission's findings of fact are conclusive on appeal when supported by such competent evidence, "even though there [is] evidence that would support findings to the contrary." However, evidence tending to support a plaintiff's claim is to be viewed in the light most favorable to the plaintiff, and "plaintiff is entitled to the benefit of every reasonable inference to be drawn from the evidence." The Commission's conclusions of law are reviewed de novo.

McRae v. Toastmaster, Inc., 358 N.C. 488, 496, 597 S.E.2d 695, 700-01 (2004) (citations omitted). "Before making findings of fact, the Industrial Commission must consider all of the evidence. The Industrial Commission may not discount or disregard any evidence, but may choose not to believe the evidence after considering it." Weaver v. American National Can Corp., 123 N.C. App. 507, 510, 473 S.E.2d 10, 12 (1996).

I. Plaintiff's Disability From Employment
An injured worker who produces evidence of a total incapacity to work is entitled to benefits under N.C. Gen. Stat. § 97-29 (2009). The employee bears the burden of establishing both the existence and extent of his disability. Hendrix v. Linn-Corriher Corp., 317 N.C. 179, 185, 345 S.E.2d 374, 378 (1986). An employer's acceptance of a claim does not shift the burden of proving disability from the employee. Clark v. Wal-Mart, 360 N.C. 41, 44, 619 S.E.2d 491, 493 (2005). ("[A]n employer's admission of the `compensability' of a workers' compensation claim does not give rise to a presumption of `disability' in favor of the employee.")
"Disability" under the Workers' Compensation Act means the "incapacity because of injury to earn the wages which the employee was receiving at the time of injury in the same or any other employment. N.C. Gen. Stat. § 97-2(9)(2009).
[I]n order to support a conclusion of disability, the Commission must find: (1) that plaintiff was incapable after his injury of earning the same wages he had earned before his injury in the same employment, (2) that plaintiff was incapable after his injury of earning the same wages he had earned before his injury in any other employment, and (3) that this individual's incapacity to earn was caused by plaintiff's injury.
Hilliard v. Apex Cabinet Co., 305 N.C. 593, 595, 290 S.E.2d 682, 683 (1982).
To satisfy the burden of proving disability, an employee may: (1) produce medical evidence that as a result of a work-related injury the employee is mentally or physically incapable of work in any employment; (2) produce evidence that although capable of work, the employee has been unable to obtain employment despite a reasonable effort to locate work; (3) produce evidence that although capable of work, the employee's seeking employment would be futile because of preexisting conditions such as age, experience, or education; or (4) produce evidence that the employee obtained employment at a wage less than what the employee earned prior to the injury. Russell v. Lowes Product Distribution, 108 N.C. App. 762, 765, 425 S.E.2d 454, 457 (1993).
"This Court has previously held that an employee's own testimony as to pain and ability to work is competent evidence as to the employee's ability to work." Byrd v. Ecofibers, Inc., 182 N.C. App. 728, 731, 645 S.E.2d 80, 82, disc. review denied, 361 N.C. 567, 650 S.E.2d 599 (2007). Once the employee meets the burden of demonstrating disability, "the defendant who claims that the plaintiff is capable of earning wages must come forward with evidence to show not only that suitable jobs are available, but also that the plaintiff is capable of getting one, taking into account both physical and vocational limitations." Kennedy v. Duke Univ. Med. Center, 101 N.C. App. 24, 33, 398 S.E.2d 677, 682 (1990).
Keeping these principles in mind, we turn now to the facts of this case. The Full Commission found as a fact "that as [of] November 7, 2002 and continuing to the present, the plaintiff has been and is unable to work as a result of her compensable injuries."
Defendant first argues that the Commission erred in finding and concluding that Plaintiff was disabled from all employment. Defendant contends that the Full Commission erred when it relied "solely" on the testimony of Dr. Earwood to support this finding. Defendant argues that because the record contains no competent evidence to support the findings and conclusions rendered from a reliance on Dr. Earwood's testimony, this Court is not bound by the Commission's findings.
In support of this proposition, Defendant relies on Cannon v. Goodyear Tire & Rubber Co., 171 N.C. App. 254, 614 S.E.2d 440, disc. rev. denied, 360 N.C. 61, 621 S.E.2d 177 (2005). However, in that case, we stated only that we are not bound by the findings of the Commission when they are not supported by competent evidence in the record. Id. at 259-60, 614 S.E.2d at 444. "When there is any evidence in the record that tends to support a finding of fact, the finding of fact is supported by competent evidence and is conclusive on appeal." Id. at 259, 614 S.E.2d at 444. Moreover, the Commission is entitled to give greater weight to the testimony of some doctors over others. Hensley v. Industrial Maint. Overflow, 166 N.C. App. 413, 420, 601 S.E.2d 893, 898-99 (2004).
To prevail, Defendant must demonstrate that the testimony of Dr. Earwood did not constitute competent evidence. Here, Defendant seeks to do this by attacking the credentials of Dr. Earwood to testify as an expert. Defendant observes that Dr. Earwood testified that he is not trained to complete disability exams. He testified he did not go to school to give opinions on disability. Defendant argues that Dr. Earwood's opinions do not constitute competent evidence to support the findings.
Defendant argues further that in relying "solely" on Dr. Earwood's testimony, the Commission ignored the testimony of Dr. Fleck, Dr. Hoski, Dr. Cammarata, and Dr. Hanson. Defendant argues that, contrary to the Commission's findings, the competent evidence shows Plaintiff is not medically disabled.
In essence, Defendant asks this Court to reassess the credibility of Dr. Earwood. This we may not do. See Russell, 108 N.C. App. at 765, 425 S.E.2d at 457 ("In weighing the evidence, the Commission is the sole judge of the credibility of witnesses and the weight to be given their testimony . . . ."). Insofar as Defendant asks this Court to re-weigh the evidence, we refuse to invade the province of the Industrial Commission. Insofar as Defendant suggests that no competent evidence was introduced to support the Commission's finding of Plaintiff's disability, we hold that Dr. Earwood's testimony constitutes competent evidence.
Indeed, the Commission's findings indicate that it balanced Dr. Earwood's testimony against that of the other doctors who testified and gave "greater weight to the opinion of Dr. Earwood on the extent of the plaintiff's disability." We discover no error in this determination. See Hensley, 166 N.C. App. at 420, 601 S.E.2d at 898-99. Moreover, the Opinion & Award indicates that the Commission considered "plaintiff's own testimony that she could no longer do the inspection job as of March 24, 2002," to establish that she was disabled. Plaintiff's own testimony constituted competent evidence which the Commission was entitled to consider. See Byrd, 182 N.C. App. at 731, 645 S.E.2d at 82. Defendant's argument that Plaintiff failed to meet her initial burden of demonstrating total disability is without merit.[1]
We next consider Defendant's argument that the Commission erred in finding that it would be futile for the plaintiff to look for employment considering her multiple work-related medical conditions. The Commission found as a fact that:
"To the extent that Dr. Fleck and Dr. Hoski opined that the plaintiff may be capable of some work within the restrictions they provided, the Full Commission finds that it would be futile for the plaintiff to look for employment considering her multiple medical conditions resulting primarily from her work-related injuries, her resulting physical restrictions due to her work related injuries, and her vocational factors such as her advanced age (64), her limited education (9th grade), and her prior work history."
Defendant maintains that the error of this finding is demonstrated by the fact that Plaintiff located employment as a packing inspector with Defendant. "Plaintiff-Appellee refused the employment offer and chose retirement instead." Furthermore, Defendant asserts that no evidence was proffered by Plaintiff that she was unemployable because of preexisting conditions; and no evidence was produced that Plaintiff located employment at a lesser wage. Defendant concludes from this that the Commission failed to conduct a proper application of Russell to the competent evidence before it.
Here, the uncontested findings indicate that Defendant's offer of the inspector job was made to Plaintiff at the end of 2001, and she accepted that offer. Plaintiff continued to work in the inspector job until March 24, 2002. Though Defendant contests the finding, the Commission found that Plaintiff was incapable of performing the inspector's job as a result of the restrictions imposed by Dr. Earwood and her own symptoms of pain in her neck and numbness in her arms.
The Commission is required to provide findings of fact only to the extent necessary to support its conclusions of law. See Peagler v. Tyson Foods, Inc., 138 N.C. App. 593, 602, 532 S.E.2d 207, 213 (2000). We held above that Dr. Earwood's opinion, coupled with Plaintiff's own testimony, was sufficient to support the Commission's finding that Plaintiff was unable to work as a result of her compensable injuries. Because this satisfies Russell, we need not address Defendant's objection to the Commission's finding that it would be futile for Plaintiff to look for other employment.

II. Unjustifiable Refusal of Suitable Employment
Defendant next argues that it successfully rebutted Plaintiff's evidence of disability by demonstrating the availability of a suitable job. See Kennedy, 101 N.C. App. at 33, 398 S.E.2d at 682. The issue is therefore whether Plaintiff was justified in leaving the job she had accepted with Defendant as a packing inspector. The Commission concluded that Plaintiff's decision to retire after she could not continue working does not constitute a refusal to work. Defendant argues that no competent evidence supports this conclusion.
An injured worker who unjustifiably refuses suitable employment is not entitled to compensation. N.C. Gen. Stat. § 97-32 (2009). The burden is on the employer to show that an employee refused suitable employment. Gordon v. City of Durham, 153 N.C. App. 782, 787, 571 S.E.2d 48, 51 (2002). "Once the employer shows to the satisfaction of the Commission that the employee was offered suitable work, the burden shifts to the employee to show that his refusal was justified." Byrd, 182 N.C. App. at 731, 645 S.E.2d at 82.
Defendant contends that it proffered substantial evidence that suitable employment was available to Plaintiff, that she was capable of obtaining this employment, and the employment would have allowed Plaintiff to earn wages. The competent evidence shows, according to Defendant, that the packing inspector position which Plaintiff held prior to her retirement was suitable to the restrictions imposed by her physicians. Defendant points to Dr. Cammarata's and Dr. Hoski's approval of the inspector position. Had the testimony of these doctors been considered, Defendant argues that "it would have required a finding that the position was suitable employment" and that Plaintiff unjustifiably refused to work.
Defendant acknowledges that Dr. Earwood testified that Plaintiff was unable to perform the packing inspector position. Defendant observes however that Dr. Earwood neither viewed the video (depicting an employee at work in the position) nor reviewed the written job description. He admitted that he was not familiar with the packing inspector position. Defendant asserts that Dr. Earwood's testimony shows that he had no knowledge of the duties of the position or of whether the duties complied with Plaintiff's restrictions. Defendant concludes that Dr. Earwood's testimony does not constitute competent evidence.
Dr. Earwood testified that he got his information regarding the physical activity involved in the inspector position from Plaintiff herself, and from a picture. Dr. Earwood's testimony constitutes competent evidence. Moreover, Dr. Fleck in December 2002 restricted Plaintiff from doing any prolonged work above shoulder level. It is uncontested that Defendant did not provide Plaintiff a job that would accommodate her medical restrictions as given by Dr. Fleck.
Rather than indicate a failure to consider Defendant's evidence, the Commission's findings indicate that "[a]lthough Dr. Fleck and Dr. Hoski did not totally remove the plaintiff from work . . . Dr. Earwood's testimony that as of November 7, 2002 the plaintiff could not work, is given greater weight . . . ." As noted above, the Commission is the sole judge of the weight to be given witness' testimony. Russell, 108 N.C. App. at 765, 425 S.E.2d at 457. We therefore hold that there was competent evidence reflected in findings of fact to support the Commission's conclusion of law that Plaintiff's decision to retire was not a refusal to work.

III. Entitlement to Additional Medical Compensation
The Commission concluded as a matter of law that Plaintiff was entitled to "all reasonable medical treatment necessitated by her compensable injuries, which is designed to effect a cure, provide relief or lessen her disability, including future medical treatment." Defendant argues that this conclusion is not supported by competent evidence and is based on a misapprehension of law.
Hyler v. GTE Products Co., 333 N.C. 258, 425 S.E.2d 698 (1993), allows for an employee to recover new or additional medical compensation "even if there has been no material change in the employee's condition or in available medical treatments." Id. at 267, 425 S.E.2d at 704. Hyler of course requires the employee's injury to have occurred on the job. Id. The Workers' Compensation Statutes were amended following the Court's decision in Hyler. "New section 97-25.1 at least partially reverses Hyler by reimposing a two-year statute of limitations on reopening claims for medical compensation." McAllister v. Wellman, Inc., 162 N.C. App. 146, 149, 590 S.E.2d 311, 313 (2004)(quoting John Richard Owen, The North Carolina Workers' Compensation Act of 1994: A Step in the Direction of Restoring Balance, 73 N.C. L.Rev. 2502, 2506, 2509-2510 (1995)). Both parties agree that, because of their dates of occurrence, Plaintiff's first two injuries are governed by Hyler.
N.C. Gen. Stat. § 97-25 allows the Commission to order medical compensation. The Commission's authority to award future medical compensation is circumscribed by N.C. Gen. Stat. § 97-25.1.
The right to medical compensation shall terminate two years after the employer's last payment of medical or indemnity compensation .. . . If the Commission determines that there is a substantial risk of the necessity of future medical compensation, the Commission shall provide by order for payment of future necessary medical compensation.
N.C. Gen. Stat. § 97-25.1 (2009). "If additional medical treatment is required, there arises a rebuttable presumption that the treatment is directly related to the original compensable injury and the employer has the burden of producing evidence showing the treatment is not directly related to the compensable injury." Reinninger v. Prestige Fabricators, Inc., 136 N.C. App. 255, 259, 523 S.E.2d 720, 723 (1999).
Regarding Plaintiff's first and second injuries, of 11 May 1983 and 2 February 1986, Defendant concedes that those injuries are governed by Hyler, but contends that Plaintiff's current condition as related to her knees stems from an underlying and preexisting degenerative joint disease and osteoarthritis  in other words, that her injuries are not work-related.
Defendant reviews the evidence of Plaintiff's physicians that indicates Plaintiff's knee injuries could be the result of degenerative joint disease or osteoarthritis. Defendant argues that none of Plaintiff's treating physicians have offered competent opinions that Plaintiff has not reached maximum medical improvement of her knee injuries, or that her current condition is causally related to the 1983 and 1986 injuries. Furthermore, according to Defendant, there is no competent finding that the current knee condition is causally related such that benefits under Hyler are appropriate.
On 12 June 1985, Defendant accepted the right knee injury as compensable. On 16 March 1987, Defendant accepted the left knee injury as compensable. Plaintiff was therefore entitled to the presumption that additional medical treatment is directly related to the compensable injury. Id.
Defendant argues essentially that it has rebutted this presumption. Defendant attacks the opinion of Dr. Welliver that Plaintiff's current knee conditions are directly related to work injuries. Defendant contends that Dr. Welliver's opinion does not satisfy the requirements of Holley v. ACTS, Inc., 357 N.C. 228, 232, 581 S.E.2d 750, 753 (2003)(holding that, in cases involving complicated medical questions, only an expert can give competent opinion evidence as to the cause of the injury, and testimony is not sufficiently reliable if it is based merely upon speculation and conjecture). Defendant's reliance on Holley is misplaced. Holley involved a determination of whether an alleged work-related injury was compensable in the first place, not whether an injury already determined to be compensable could be further compensated. Id. at 230-31, 581 S.E.2d at 752. Defendant in this case has already accepted Plaintiff's injuries as compensable.[2]
The Commission was entitled to determine whether Defendant had rebutted the presumption that Plaintiff's additional medical treatment was related to her compensable injuries. The Commission apparently determined that Defendant had not. This Court is not authorized to weigh the evidence leading to that determination. Adams v. AVX Corp., 349 N.C. 676, 681, 509 S.E.2d 411, 414 (1998). It follows that the Commission did not err in its application of Hyler to Plaintiff's "admittedly compensable injuries."
Regarding Plaintiff's third and fourth injuries, Defendant argues that before the Commission may award future medical compensation, § 97-25.1 requires that sufficient evidence be presented to allow the Commission to determine that "a substantial risk of the necessity of future medical compensation" exists. N.C. Gen. Stat. § 97-25.1 (2009). Defendant maintains that in the present case the Commission failed to render any findings of fact that such a substantial risk exists.
However, under § 97-25.1, the requirement of a finding of "substantial risk" is applicable only when the Commission orders payment of medical compensation beyond a two-year period. See N.C. Gen. Stat. § 97-25.1 (2009). There was no such award projected in this case. Therefore the Commission was not required to make a finding of substantial risk of the necessity of future medical compensation. See Gregory v. W.A. Brown & Sons, 192 N.C. App. 94, 108, 664 S.E.2d 589, 597 (holding that where the record was silent regarding the application of the statute of limitations, the Commission's award was nevertheless subject to N.C. Gen. Stat. § 97-25.1), writ allowed, disc. review on additional issues denied, 362 N.C. 681, 670 S.E.2d 232 (2008). Thus, there is no merit to Defendant's argument that Plaintiff is not entitled to additional medical compensation.
Affirmed.
Judge CALABRIA and Judge BEASLEY concur.
Report per Rule 30(e).
NOTES
[1] Plaintiff argues that Defendant has conceded that Plaintiff was already at least partially disabled when she lost earning capacity between her tenth and eleventh surgeries. Plaintiff contends this places the burden of proof with Defendant. Since the issue here is the extent of Plaintiff's disability, we have considered the matter as though the burden of proof remained with Plaintiff. This should not be considered a departure from the recognition that generally a presumption of disability follows a Form 21 agreement. See Kisiah v. W.R. Kisiah Plumbing, 124 N.C. App. 72, 76-77, 476 S.E.2d 434, 436 (1996).
[2] Moreover, Dr. Welliver's opinion that "the patient's current state of affairs is directly related to the injury sustained in 1983" is more substantial than the speculation and conjecture found insufficient in Holley. See Holley, 357 N.C. at 233-34, 581 S.E.2d at 753-54.